UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
CASE NO.: 06-20459-CIV-GOLD

MONTICELLO INSURANCE COMPANY,
a Delaware Corporation,

      Plaintiff,

v.

CITY OF MIAMI BEACH; ISRAEL POLEYEFF,
as Personal Representative of Eugenie Poleyeff;
and FREDERICA BREAUX, as Administratrix of the
Estate of Zachary Charles Breaux,

      Defendants.
_____ /

## MEMORANDUM OF DECISION SETTING FORTH FINDINGS OF FACT AND CONCLUSIONS OF LAW ON PHASE I OF BIFURCATED INSURANCE DISPUTE

### I. INTRODUCTION

Phase I of this bifurcated insurance case centers on whether the City of Miami

Beach qualifies for coverage as an additional insured under an insurance policy issued by

Monticello Insurance Company to Hurricane Beach Rentals (a beach concessionaire) for

two drownings that occurred in the Atlantic Ocean.[1] The policy contains an "additional

insured" endorsement (the "AI Endorsement") which provides that the City of Miami Beach

---

[1] The City of Miami Beach entered into Coblentz agreements, a settlement and release agreement between an insured and an injured party in which the insured assigns to the injured party all causes of action that it has against a liability insurer. The City of Miami Beach settled with the estate of Breaux for the sum of $5,000,000.00; with the City paying $160,000 and assigning its right to the insurance claim for the remaining amount. The City settled with Poleyeff for $750,000; the city to pay $40,000 and similarly assigning its right to the insurance claim for the remaining amount.

1

is an insured "but only with respect to liability arising out of the operations performed for [the City of Miami Beach] by or on behalf of [Hurricane Beach Rentals]." Joint Ex. 2.

On March 2, 2008, this Court approved, at the request of the parties, a bifurcated procedure for trial as between the coverage issue and the issues pertaining to the good faith and reasonableness of the settlement agreement [DE 110].[2] The parties also agreed that the dispositive issue of coverage should be addressed first at a non-jury trial. Accordingly, a non-jury trial was held on February 9, 2009 at which time the Court heard from the following witnesses: Gary Sanborn, William Gunter, Jr., Frederica Breaux and Rabbi Israel Poleyeff.[3] The following additional testimony was received by depositions: Michael Suskind, Shawn Galicic, Jason Albarano, Willian Galicic, John Albarano, Vincent Andreano, Jeff Kraus, and Deb Vilas.

In accordance with Fed. R. Civ. P. 52(a)(1), I hereby enter the following findings of fact and conclusions of law.

## II. AGREED STATEMENT OF FACTS

A.    Effective December 9, 1996, Monticello issued a commercial general liability policy to Hurricane Beach Rentals, a concessionaire which rented beach equipment and watercraft on Miami Beach, which insurance policy was required by the City as a condition of licensure for Hurricane Beach Rentals

---

[2] In my prior Order Denying Plaintiff's Motion to Dismiss Counterclaim, I held that in Florida, to recover under a Coblentz agreement, the injured party must prove: (1) coverage; (2) wrongful refusal to defend; and, (3) that the settlement was reasonable and made in good faith." Monticello Ins. Co. v. City of Miami Beach, 2008 WL 906537, *3 (S.D. Fla., Apr. 3, 2008) (citations omitted). As agreed to by the parties, the questions of wrongful refusal to defend and the reasonableness of the settlement will be addressed in Phase II of the bifurcated trial. See Agreed Fact II.

[3] Gary Sanborn is a managing general agent with Crump Insurance Services, which at the time of the drownings represented and underwrote policies for Monticello Insurance Company. William Gunter, Jr. is Plaintiff's expert.

to be permitted to operate its concession on the beach at 29th Street.

B.    Hurricane Beach Rentals was required to obtain an insurance policy listing the City of Miami Beach as an additional insured in order to obtain its occupational license from the City of Miami Beach allowing it to operate as a concessionaire on the beach.

C.    The insurance policy contains an additional insured endorsement naming the City of Miami Beach as an additional insured "but only with respect to liability arising out of the operations performed for such additional insured by or on behalf of the named insured."

D.    The insurance policy does not define the terms "arising out of" or "operations."

E.    The policy states that the business description for Hurricane Beach Rentals is "beach chair/umbrella/cabana rentals."

F.    The policy does not contain specific language stating that coverage for the City is limited to its vicarious liability for the negligence of Hurricane Beach Rentals or that that there is no coverage for the City's own negligence.

G.    On February 20, 1997 Eugenie Poleyeff and her husband, Rabbi Israel Poleyeff, were paying guests at the Saxony Hotel at 32nd Street on Miami Beach. They walked along the beach to the area behind the Seville Hotel at 29th Street so that they could use the beach and ocean in an area where beach rental equipment was available, and rented a double beach lounge and umbrella from Hurricane Beach Rentals.

H.    On February 20, 1997 Frederica Breaux, her husband, Zachary Charles Breaux and their three daughters were paying guests at the Seville Hotel at 29th Street on Miami Beach, and rented a double beach lounge from Hurricane Beach Rentals.

I.    Mrs. Poleyeff went into the ocean and became caught in a rip current and screamed for help. Zachary Breaux attempted to rescue her, however, both of them drowned.

J.    The Estates of Poleyeff and Breaux subsequently brought separate wrongful death suits in Dade County Circuit Court against the City of Miami Beach, the Seville and Saxony hotels, and Hurricane Beach Rentals.

K.    In the wrongful death lawsuits brought by Breaux and Poleyeff in Dade County Circuit Court against the City of Miami Beach, the Seville and

3

Saxony hotels and Hurricane Beach Rentals, the following allegations against the City of Miami Beach were made:

39. That the Defendant, MIAMI BEACH, breached its duties owed to ZACHARY BREAUX (and EUGENIE POLEYEFF) in the following respects:

A. Failed to operate a designated water recreation area in a reasonably safe manner.
B. Failed to have a lifeguard station in an area where the public was invited and attracted to use the beach and ocean by virtue of the existence of public restrooms, showers, drinking fountains, and parking , along with the operation of concessions renting beach lounges, chairs, watercraft and/or other water recreation equipment.
C. Failed to have adequate, trained lifeguards present to protect users of the beach and/or ocean in an area where the public was invited and attracted to use the beach and ocean by virtue of the existence of public restrooms, showers, drinking fountains, and parking, along with the operation of concessions renting beach lounges, chairs, watercraft and/or other water recreation equipment.
D. Failed to have a warning system for rip currents and/or other dangerous surf conditions by use of  warning signs, warning flags, condition boards, or other warning means.
E. Failed to have available on the beach safety equipment such as throw bags with attached lines, life preservers and/or a dedicated emergency telephone line.
F. Failed to have their roving lifeguards adequately protect users of the beach and ocean in areas not proximate to lifeguard stations.
G. In the alternative, failed to post warnings that the beach was unguarded and that swimmers should proceed eight blocks south to 21st Street or 6 blocks north to 35th Street, where lifeguards were present, before entering the ocean.

L.     The trial court dismissed with prejudice the claims against the two hotels and Hurricane Beach Rentals for failure to state a cause of action on the ground that the hotels and beach concessionaire did not owe a duty to warn swimmers of dangers in the ocean.  The trial court later entered summary judgment in favor of the City of Miami Beach based on an argument that the negligent acts alleged were planning-level decisions subject to sovereign immunity.  The estates of Breaux and Poleyeff appealed all rulings.

M.     On appeal, the Third District Court of Appeals affirmed the trial court's dismissal of Hurricane Beach Rentals and the two hotel defendants, concluding that they did not owe a duty to warn swimmers of dangers in the ocean.  Poleyeff v. Seville Beach Hotel Corp., 782 So. 2d 422 (Fla. 3d DCA 2001). Specifically, the Third District Court of Appeals, in affirming dismissal of the claims against Hurricane beach Rentals stated, "…[W]e hold that an entity which does not control the area or undertake a particular responsibility to do so has no common law duty to warn, correct, or safeguard others from naturally occurring, even if hidden, dangers common to the waters in which they are found." Id. at 424.

N.     The Third District Court of Appeals also noted with respect to Hurricane

4

Beach Rentals that "a similar duty might arise if, for example, Hurricane Beach Rentals rented a watercraft for use in an area of the ocean in which it was aware that rip currents were present. These cases stand in contrast to the present one, in which the businesses of operating hotels and renting beach chairs only tangentially or collaterally relate to their customers' use of the ocean." *Poleyeff v. Seville Beach Hotel Corp.*, 782 So. 2d 422, 424 (Fla. Dist. Ct. App. 2001).

O.    The case against the City of Miami Beach was appealed to the Florida Supreme Court, which held that the City of Miami Beach "had an operational-level duty of care to warn the public of any dangerous conditions of which it knew or should have known at the 29th Street beach area." *Breaux v. City of Miami Beach*, 899 So. 2d 1059, 1065 (Fla. 2005).

P.    In finding that the City of Miami Beach owed an operational duty of care to warn, the Florida Supreme Court stated: "We conclude that the totality of the circumstances in the case demonstrates that the City was operating a public swimming area at the 29th Street location. The City knew that the public was using this location for swimming. There were no signs warning the public not to swim and both the Poleyeff family and the Breaux family saw people using the area for swimming. Moreover, although the City did not have a lifeguard station at the 29th Street Beach area, the City built beach facilities at this location and provided metered parking at the end of 29th Street. Of even greater significance, the City licensed a concessionaire to rent beach chairs, umbrellas, and watercraft at this location, thereby deriving revenue from the public's use of this particular beach area." *Breaux v. City of Miami Beach*, 899 So. 2d 1059, 1065 (Fla. 2005).

Q.    The Florida Supreme Court also acknowledged the Third District Court of Appeals' conclusion that "Hurricane Beach Rentals had no 'duty to warn, correct, or safeguard others from naturally occurring, even if hidden, dangers common to the waters in which they are found' because they did 'not control the area or undertake a particular responsibility to do so.'" *Breaux v. City of Miami Beach*, 899 So. 2d 1059, 1063 (Fla. 2005).

R.    At some point prior to February 20, 1997, Rabbi Poleyeff and his wife had walked up and down the boardwalk and observed the Hurricane Beach Rentals' kiosk.

S.    On February 19, 1997, the day before the drownings, the Breauxs rented a beach lounge from Hurricane Beach Rentals and observed the Hurricane Beach Rentals' kiosk.

T.    The insurance policy contains a lifeguard services exclusion, which excludes coverage for "bodily injury, property damage, personal injury and advertising

injury for which the insured may be held liable because of the rendering or failure to render lifeguard services and/or lifesaving equipment."

U.     The policy does not define the terms "lifeguard services" or "lifesaving equipment."

V.     The policy does not contain specific language stating that it does not cover for drownings.

W.    On February 20, 1997, Frederica Breaux subjectively believed that the employees of Hurricane Beach Rentals were lifeguards.

X.     Hurricane Beach Rentals employees were not lifeguards.

Y.     Hurricane Beach Rentals employees were not contracted to or responsible for performing any type of lifeguarding duties on behalf of the City of Miami Beach.

Z.     Hurricane Beach Rentals had nothing to do with the hiring or placement of lifeguards on the beach.

AA.   Hurricane Beach Rentals did not have any type of lifeguarding signage on or around its beach hut or pad shack.

BB.   There was no signage at or near the Hurricane Beach Rentals' kiosk identifying Hurricane Beach Rentals.

CC.   Hurricane Beach Rentals did not have any type of signage on or around its beach hut or pad shack warning of dangers in the ocean or weather advisories.

DD.   Hurricane Beach Rentals' employees did not tell the Breauxs or Poleyeffs that they were or were not lifeguards.

EE.   Hurricane Beach Rentals' employees did not sit on any type of elevated chairs or stands.

FF.The     Defendants do not contend that they were injured by Hurricane Beach Rentals' beach lounges or umbrellas.

GG.   On the date in question, there was no signage or other warnings at or near the subject beach area at 29th Street to warn that this beach area was not lifeguarded or whether any dangerous conditions existed.

HH. The waverunner exclusion is not applicable. The parties agree that waverunners had nothing to do with the incident at issue. Although certain designated deposition testimony might mention waverunners or jet skis because of the context of the question, the parties agree that waverunners are not an issue in this case.

II. The parties agree that the City of Miami Beach demanded a defense and coverage, and that Monticello denied a defense and coverage. The parties agree that the duty to defend issue will be addressed in Phase 2 of the bifurcated trial.

Amended Pretrial Stipulation [DE 190].

## III. ADDITIONAL FINDINGS OF MATERIAL FACT

1. Frederica Breaux, her now deceased husband, Zachary Charles Breaux, and their three children, rented beach chairs from Hurricane Beach Rentals on February 19th and 20th, 1997. The Breaux family chose this location because they assumed the Hurricane Beach Rentals hut, as staffed by two persons in light colored shorts, were lifeguards and that the area was, therefore, safe for ocean access. Breaux Dep. at 32-34. They further assumed the area was safe because a number of other beach goers were congregated around the hut on rented beach chairs and were swimming in the area near the hut. Breaux Dep. at 19-20, 26-27; Breaux Aff. at ¶ 4 [DE 42-2]. The safety issue was important to the Breaux family, who would not have chosen the location if it appeared unguarded. Breaux Dep. at 35-36; Breaux Aff. at ¶ 6.

2. The Hurricane Beach Rentals hut was operated by Hurricane Beach Rentals as part of its concession with Miami Beach. Cushions for beach chairs and umbrellas were rented at that location. The hut contained no signage indicating that the services offered were limited to beach chair and umbrella rentals, that there were no lifeguards in the area, or that there were any dangerous water conditions. Breaux Aff. at ¶ 5. The Breaux family

7

received no verbal warnings that the hut's purpose was limited to beach chair and umbrella rentals. At the time of the drownings, Frederica Breaux sought assistance from the persons occupying the hut who she assumed to be lifeguards.  Breaux Dep. at 38-39; Breaux Aff. at ¶ 6; John Albarano Dep. at 18, 20-21.

3. Similarly, Rabbi Poleyeff and his wife, Eugenie Poleyeff, chose the same location on February 20th, 1997 because they assumed that the Hurricane Beach Rentals hut was a lifeguard station. They also rented beach chairs and felt safe because of the number of other persons who were congregated around the hut and who also had rented beach chairs from Hurricane Beach Rentals. They specifically chose this area because they thought it had lifeguards and because of the availability of beach chair rentals.  Poleyeff Dep. at ¶ 3, 5, 6

4. It is reasonably foreseeable that beach goers renting beach chairs and cushions at the subject location, from a hut that gave the appearance of a lifeguard station, would likely enter the water and swim in the ocean, as compared to other locations along the beach where chair and umbrella rentals from such a hut are not available.

5. The operation of Hurricane Beach Rentals from a beach hut/kiosk resulted in the area around the beach hut to be crowded with beach goers on February 20, 1997, and made it appear the area of 29th Street was a protected, guarded swimming area. Vilas Dep at 10-11; Krauss Dep. at 26.

6. In February of 1997, City of Miami Beach lifeguards informed concessionaires, including Hurricane Beach Rentals, that they should let their customers know of the water conditions on a daily basis. Andreano Dep. at 123. Moreover, Miami Beach lifeguards had discussions warning concessionaires, including Hurricane Beach Rentals, about how to

8

identify rip currents and the dangers of rip currents. Id. at 125. Rip currents were present on the day of the drownings.

## IV. CONCLUSIONS OF LAW ON DISPUTED LEGAL ISSUES

**A.     Whether according to the terms of the Additional Insured Endorsement there is coverage for the City of Miami Beach for its own negligence or whether coverage is only provided for the City's vicarious liability for the negligence of Hurricane Beach Rentals?**

The parties dispute the proper interpretation of the AI Endorsement. To determine the scope of the AI Endorsement, I review the applicable law in Florida as it relates to the interpretation of insurance policies and consider whether extrinsic evidence regarding the parties' intent or expectations behind the AI Endorsement can be taken into consideration.

### 1.     Applicable Florida Law

The construction of an insurance policy is a question of law for the court.[4] *Jones v. Utica Mut. Ins. Co.*, 463 So. 2d 1153, 1157 (Fla. 1985). "Under Florida law, insurance contracts are construed according to their plain meaning." *Taurus Holdings, Inc. v. United States Fid. and Guar. Co.*, 913 So.2d 528, 532 (Fla. 2005). Where a contractual term is ambiguous, the term is construed against the insurer as drafter of the policy. *Swire Pac. Holdings, Inc. V. Zurich Ins. Co.*, 845 So.2d 161, 165 (Fla. 2003) (An ambiguous provision is construed in favor of the insured and *strictly* against the drafter) (emphasis added); *Auto-Owners Ins. Co. v. Anderson*, 756 So.2d 29, 34 (Fla. 2000) (like ambiguous policy provisions, ambiguous insurance policy exclusions are construed against the drafter and

---

[4] In this diversity action, as is the case here, a federal court applies the substantive law of the forum state, unless federal constitutional or statutory law is contrary. See *Insurance Co. of N. Am. v. Lexow*, 937 F.2d 569, 571 (11th Cir. 1991).

in favor of the insured). Whether a contract provision is ambiguous is a question for the court. *Penzer v. Transportation Ins. Co.*, 509 F. Supp. 2d 1278, 1281 (S.D. Fla. 2007); *Escobar v. United Auto. Ins. Co.*, 898 So.2d 952, 954 (Fla. Dist. Ct. App. 2005); *Strama v. Union Fid. Life Ins. Co.*, 793 So.2d 1129, 1132 (Fla. Dist. Ct. App. 2001). To be ambiguous, the contract provision must subject to differing interpretations, and the interpretation supporting coverage will be used. *State Farm Fire & Cas. Co. v. CTC Dev. Corp.*, 720 So.2d 1072, 1076 (Fla. 1998) (exclusionary provisions which are ambiguous or otherwise susceptible to more than one meaning *must* be construed in favor of the insured, since it is the insurer who usually drafts the policy) (emphasis added). However, "to allow for such a construction, the provision must actually be ambiguous... [and] courts may not rewrite contracts, add meaning that is not present, or otherwise reach results contrary to the intentions of the parties." *Taurus Holdings*, 913 So.2d at 532; *State Farm Mut. Ins. Co. v. Pridgen*, 498 So. 2d 1245, 1248 (Fla. 1986) (it is "only when a genuine inconsistency, uncertainty, or ambiguity in meaning remains after resort to the ordinary rules of construction" that the ambiguity must be construed in favor of the insured). Indeed, because the insurer is the drafter of the policy, the onus is on the insurer to expressly represent such intentions or expectations in the language of the policy. *Container Corp. of Am. v. Maryland Cas. Co.*, 707 So. 2d 733, 736 (Fla. 1998).

Here, the insurance policy contains an additional insured endorsement naming the City of Miami Beach as an additional insured "but only with respect to liability arising out of the operations performed for such additional insured by or on behalf of the named insured." Without dispute, the AI Endorsement policy language was drafted by the Insurer

10

and, after submission, was approved by the state regulatory agency.

The insurance policy does not define the terms "arising out of" or "operations."[5] Nonetheless, the Plaintiff contends that coverage is not afforded to Miami Beach as an additional insured because the City's liability for the drowning (1) did not arise out of Hurricane Beach Rental's operations, and (2) because the AI Endorsement does not provide coverage to the City in the absence of negligence on the part of the named insured. Defendants disagree, and argue that the phrase "but only with respect to liability arising out of the operations performed for such additional inured by or on behalf of the named insured" in the AI Endorsement is ambiguous as to whether it provides coverage for the City's own negligence.

---

[5] As noted, the term "operations" was not defined in the Monticello policy. Florida courts have held that where the term "operations" is not defined, it should be given its plain meaning and should be broadly interpreted. *Itnor Coorp. v. Markel International Insurance Company,* 981 So. 2d 661, 663 (Fla. Dist. Ct. App. 2008). And as discussed above, when an insurer fails to define a policy term having more than one meaning, the insurer cannot argue a narrow or restrictive interpretation of the coverage provided. *State Farm Fire & Cas. Co. v. CTC Dev. Corp.,* 720 So.2d 1072, 1076 (Fla.1998).

"Operations" has been defined as "[a]n act, process, or way of operating," "[a] process or series of acts aimed at producing a desired result or effect," or "[a] method or process of productive activity." Webster's II New Riverside University Dictionary, 824 (1984). In *Container Corp. of Am. v. Maryland Cas. Co.,* 707 So. 2d 733 (Fla. 1998), the term "operations" was not defined (like here) in the insurance policy. The Florida Supreme Court concluded that although the lack of a definition of an operative term used in a policy does not necessarily mean that the term is ambiguous, because the policy language in that case was susceptible to differing interpretations, it needed to be construed in favor of the insured. Id. at 736. Moreover, because there was a contract between the named insured and the addi tional insured, the Florida Supreme Court construed "operations" to mean work done in the performance of that contract. The same reasoning applies here with regard to the concession license given by the City of Miami Beach to Hurricane Beach Rentals, such that "operations" means work and services done by Hurricane Beach Rentals in its performance as the licensed concessioner by renting beach chairs, umbrellas and water craft.

11

I start by noting the holding of the Eleventh Circuit in *James River Ins., 540 F.3d at*

1275 that phrase "arising out of" is not ambiguous as a matter of law and should be

interpreted broadly.

> "[T]he Florida Supreme Court held that the phrase "arising out of" is not ambiguous and should be interpreted broadly. Id. at 539. The court declared that "the term 'arising out of' is broader in meaning than the term 'caused by' and means 'originating from,' 'having its origin in,' 'growing out of,' 'flowing from,' 'incident to' or 'having a connection with.' " Id. To have arisen out of something, there must be "some causal connection, or relationship" that is "more than a mere coincidence" but proximate cause is not required. Id. "[T]he phrase 'arising out of' contemplates a more attenuated link than the phrase 'because of.' " *Garcia v. Fed. Ins. Co.*, 969 So.2d 288, 293 (Fla. 2007).

While the phrase "arising out of" may not be itself ambiguous, the question is

whether the remaining language in the AI Endorsement is ambiguous to the extent it is

unclear whether the endorsement covers the additional insured for its own negligence or

only for the vicarious liability for the negligence of the named insured.[6] In *Container Corp.*

*of Am. v. Maryland Cas. Co.*, 707 So.2d 733 (Fla. 1998), the Florida Supreme Court

discussed cases which held that language nearly identical to the one at issue in this case

was ambiguous because it is unclear whether the endorsement covers the additional

insured for its own negligence or only for its vicarious liability for the negligence of the

named insured. Id. at 736. Specifically, the Florida Supreme Court discussed *Fla. Power*

*& Light v. Penn Am. Ins. Co.*, 654 So. 2d 276, 278 (Fla. Dist. Ct. App. 4th Dist. 1995) and

noted:

> In *Florida Power & Light*, a contract between Florida Power and Light (FP&L) and Eastern Utility Construction, Inc. (Eastern), ... required the

---

[6] I return later in this Order to address the Plaintiff's argument that the City's liability for the drowning did not "arise out of" Hurricane Beach Rental's operation.

12

contractor to purchase general liability insurance. The policy procured by the contractor defined "Persons or Entities Insured" as "any person, organization, trustee, or estate...*but only with respect to operations by or on behalf of the Named Insured or to facilities used by the Named Insured."* *Florida Power & Light*, 654 So. 2d at 278. Thereafter, an employee of the contractor who was injured at the substation sued FP&L for its negligence related to his injury. The issue before the court was whether the personal injury claim came within the ambit of the definitional provision "but only with respect to operations by or on behalf of the Named Insured." In concluding that FP&L was an additional insured under the policy, the court stated:

> ... the pertinent policy language merely reads "but only with respect to operations by or on behalf on the Named Insured," Eastern. No language in the provision requires fault on behalf of Eastern before FPL can be considered an additional insured. Thus, the language, similar to the language utilized in the cases discussed above, *can only be considered ambiguous at best.* The language that was employed ... required only that FPL's liability arise out of the operations of Eastern. ... [B]ecause Penn America *did not utilize specific language limiting coverage to the vicarious liability situation and because the language actually utilized is ambiguous at best, the "additional insured" provision must be construed against Eastern and in favor of FPL, the insured.*

*Container*, 707 So.2d at 736 (quoting *Florida Power & Light*, 654 So. 2d at 279 (emphasis added)).

The Florida Supreme Court further noted that:

> Several courts from other jurisdictions have interpreted "additional insured" policy provisions to reach the same result as *Florida Power & Light* in similar factual contexts. Thus, in *Casualty Insurance Co. v. Northbrook Property & Casualty Insurance Co.*, 150 Ill. App. 3d 472, 501 N.E.2d 812, 103 Ill. Dec. 495 (Ill. App. Ct. 1986), the language adding the additional insured read: "but only with respect to liability arising out of operations performed for the additional insured by the named insured." 501 N.E.2d at 814. The court held that because the policy language was not expressly limiting, the additional insured was entitled to coverage for its own negligence. *Accord Philadelphia Elec. Co. v. Nationwide Mut. Ins. Co.*, 721 F. Supp. 740 (E.D. Pa. 1989) (holding that language providing coverage for liability "arising out of" operations performed for the additional insured was not limited to coverage for additional insured's

> vicarious liability); *Dayton Beach Park No. 1 Corp. v. National Union Fire Ins. Co.*, 175 A.D. 2d 854, 573 N.Y.S.2d 700 (N.Y. App. Div. 1991) (holding that failure of parties to use specific limiting language provided additional insured with coverage for its own negligence). Had Maryland wished to limit Container's coverage to vicarious liability, it could have done so by clear policy language. *See Consolidation Coal Co. v. Liberty Mut. Ins. Co.*, 406 F. Supp. 1292 (W.D. Pa. 1976) (construing coverage language as insuring the additional insured only for vicarious liability); see also *Liberty Mut. Ins. Co. v. Capeletti Bros., Inc.*, 699 So. 2d 736 (Fla. Dist. Ct. App. 1997).

*Id.*

The Florida Supreme Court accordingly held that "[b]ecause the endorsement in the instant case *contains no limiting language, we hold that Container was entitled to coverage* under the Maryland policy for its own negligence arising out of "operations at operations site by Southern Contractors." *Container*, 707 So.2d at 736 (emphasis in original).

Similarly, in *Koala Miami Realty Holding Company v. Valiant Insurance Company*, 913 So. 2d 25 (Fla. 3d DCA 2005), the endorsement at issue provided: "WHO IS AN INSURED (Section II) is AMENDED TO INCLUDE AS AN INSURED THE PERSON OR ORGANIZATION SHOWN IN THE SCHEDULE, BUT ONLY WITH RESPECT TO LIABILITY ARISING OUT OF YOUR ONGOING OPERATIONS PERFORMED FOR THAT INSURED." Id. at 26. The *Koala* court stated:

> The next question is whether the policy provides coverage for Koala's own negligence. The phrase "arising out of" used in the Valiant policy has been held to be ambiguous as it cannot be determined from the language of that phrase whether it is the named insured's or the additional insured's own negligence which is covered. *See Container Corp. v. Md. Cas. Co.*, 707 So. 2d 733 (Fla. 1998); *Fla. Power & Light Co. v. Penn Am. Ins. Co.*, 654 So. 2d 276 (Fla. Dist. Ct. App. 1995); *Container Corp.*

14

> v. McKenzie Tank Lines, Inc., 680 So. 2d 509 (Fla. Dist. Ct. App. 1996).
> In each of these cases, the policy was construed against the insurer due
> to the ambiguity. Each case held that due to the ambiguity, the policy
> provided coverage not only for the additional insured's vicarious liability,
> but also for the additional insured's direct negligence. Even though the
> policies contained the phrase "arising out of," or an analogous phrase,
> coverage for the direct negligence of the additional insured would not
> have been provided had the policies contained specific language limiting
> coverage to only the named insured's direct negligence. See Fla. Power
> & Light Co., 654 So. 2d at 278 ("but only with respect to acts or omissions
> of the named insured"). The Valiant policy does not contain any such
> limiting language. Therefore, we find that the Valiant policy provides
> coverage to the additional insured, Koala, for Koala's own negligence.

Id. at 27.

Applying this Florida case law to the AI Endorsement at issue, I conclude that, as

a matter of law, the policy endorsement language at issue is ambiguous as to the scope

of the coverage. Specifically, under one interpretation, the endorsement could be viewed

to limit coverage to circumstances in which the named insured's negligent acts or

operations directly caused the plaintiff's injury, that is, circumstances in which the

additional insured is held vicariously liable for the named insured's negligence. Under

another interpretation, the endorsement could likewise be read to cover the additional

insured's direct negligence, so long as the plaintiff's injury has some connection to the

operations that the named insured performed for the additional insured. Thus, the

language is ambiguous since it is reasonable to interpret that language both in favor of and

against coverage for the additional insured's independent negligence.

## 2.    Consideration of Parole Evidence

Having concluded the language is ambiguous, the next question is whether, under

Florida law, it necessarily follows that the language *must* be narrowly construed in favor of

the insured, such that the City of Miami Beach is entitled to coverage for its own negligence. Citing the Florida case law discussed above, Defendants argue this position because the endorsement at issue contains no limiting language. According to the Defendants, had the Plaintiff wished to limit its coverage to vicarious liability, it could have done so by clear policy language. On the other hand, Monticello argues that, given the ambiguity, it is permitted to offer expert and other parole evidence regarding its intent and reasonable expectations about the meaning of the AI Endorsement. In turn, the Defendants seek to strike the expert testimony, arguing that under Florida law, the construction of the insurance policy is a question of law for the Court, and that the Florida Supreme Court has already held that language nearly identical to that in the policy was ambiguous and must be interpreted against the insurer as providing coverage for the additional insured's direct liability. I had reserved on the Defendants' motions to strike pending the trial.[7]

I do not resort to a bright-line test as advocated by the Defendants. There are cases in Florida that suggests extrinsic evidence as to the intent of the insurer and the insured is admissible in some circumstances regarding the construction of an insurance contract. *Friedman v. Va. Metal Prod. Corp.*, 56 So. 2d 515, 517 (Fla. 1952) ("Where either general language or particular words or phrases used in insurance contracts are 'ambiguous'...so that the one applicable to the contract in question cannot be ascertained without outside

---

[7] *See* Defendants' Motions to Strike Witnesses **[DE 148]**, and Motions in Limine **[DE 171]** to exclude witness testimony. I agree with Defendants that the policy language at issue creates a patent, and compared to a latent, ambiguity. As such, there is less compelling necessity to resort to parole evidence.

16

aid, extrinsic evidence may be introduced to explain the ambiguity); *Williams v. Essex Ins. Co.*, 712 So. 2d 1232, 1232 (Fla. Dist. Ct. App. 1998) (per curiam) (where it was ambiguous whether the policy at issue was a primary or excess policy, parties are entitled to offer extrinsic evidence as to the intent of the insurer and the insured at the time the policy was purchased because it presents an issue of fact that cannot properly be resolved by summary judgment) (relying on *Universal Underwriters Ins. Co. v. Steve Hull Chevrolet, Inc.*, 513 So. 2d 218, 219 (Fla. Dist. Ct. App 1987) ("the crucial exclusionary terms of the insurance contract involved are disputed and reasonably susceptible to more than one construction, [constituting] a genuine issue of material fact regarding the parties' intent"); *Langner v. Charles A. Binger, Inc.*, 503 So. 2d 1362, 1363 (Fla. Dist. Ct. App. 1987).

The Eleventh Circuit most recently analyzed this principle in *Arriaga v. Fla. Pac. Farms, L.L.C.*, 305 F.3d 1228, 1248 (11th Cir. 2002):

> The "construction-against-the-draftsman" rule, like all such tenets, is designed as a means to reach the end-all of every problem of contractual interpretation: the intent of the parties. When that intent does not clearly appear from the words of the contract itself – that is, when it is deemed "ambiguous" – the against-the-drafter rule may be of some value *when the extrinsic evidence on the ultimate intent issue is itself inconclusive*; it may be decisive when, as in the case of contracts of adhesion such as insurance policies, there is no other evidence at all of intent beyond the words themselves.

(emphasis added) (quoting *Child v. Child*, 474 So. 2d 299, 301 (Fla. Dist. Ct. App. 1985) (just as merely circumstantial evidence must give way in the fact of contrary and conclusive direct evidence as to the ultimate fact...the adverse construction principle cannot prevail, and indeed does not even come into play, when, as here, the parties' actual intent has

17

been otherwise conclusively determined).[8]

Other Florida district courts have also found it appropriate to admit extrinsic evidence to resolve the ambiguity in insurance policies. In *Northside Marina Ventures, LLC v. Lexington Ins. Co.*, 2007 WL 2316502, *4 (S.D. Fla. 2007), the Court admitted parol evidence to clarify the parties' intent as to the meaning of an insurance policy. Because the Court found that the parol evidence provided conflicting evidence concerning the parties' intent, it relied on *Swire Pac. Holdings*, supra, to construe the policy in favor of the insured. It implies, however, that had the parol evidence revealed the "contemporaneous understanding indicative of the parties' intent in agreeing to the Policy," such an intent would have prevailed. *Id.*; see also *RTG Furniture Corp. v. Indus. Risk Ins.*, 2008 WL 4541022, *6 (S.D. Fla., Oct. 9, 2008) (where the court has found the language of the insurance policy ambiguous, extrinsic evidence can be considered to determine the intent of the parties and clarify the ambiguity).

Having permitted the Plaintiff's expert and other parole evidence in light of this authority, I nonetheless conclude that it ultimately is not useful to the Court in ascertaining the meaning of the ambiguous language. The Plaintiff's evidence is not sufficiently persuasive or conclusive as to original intent, or that industry customs and usages were directly reflected in the parties' mutual understandings concerning a limited scope of coverage.

---

[8] In *Arriaga,* 305 F.3d at 1248, a non-insurance case, the Eleventh Circuit applied the "construction-against-the-draftsman" rule in reversing a summary judgment against the party who drafted the document, because that party could have avoided the dispute by using clearer language. The Court emphasized the importance of that rule and noted that it may be decisive in the case of contracts of adhesion, such as insurance policies, where the intent must be determined from the words themselves. Id. at 1248.

18

What I do find significant is that, based on Florida case law in effect prior to the effective date of the policy in question, the Plaintiff insurance company was plainly on notice, similar to all insurance companies throughout the State of Florida, that similar policy language was interpreted by a Florida District Court of Appeal as ambiguous and, that the "additional insured" provision "must be construed against them" in favor of the additional insured unless specific language limiting coverage to the vicarious liability situation was utilized in the policy. See discussion, supra, regarding *Florida Power & Light* decision, decided prior the December 9, 1996 effective date of the commercial general liability policy at issue. Notwithstanding this plain notice, the Plaintiff did not amend its otherwise comprehensive policy language to include any specific additional language limiting coverage. Nor did it elect to charge a premium commensurate with the additional risk. Given these circumstances, I conclude that Plaintiff's parole evidence is not sufficiently compelling with concrete facts to overturn Florida's stringent traditional rules for interpreting ambiguous insurance contracts: namely, that unclear terms are interpreted against the insurer and, unless express limiting language is used, is to be construed in favor of coverage.[9]

---

9

In *Deni Assoc. of Fla., Inc. v. State Farm & Cas. Ins. Co.,* 711 So.2d 1135, 1140 (Fla. 1998), the Florida Supreme Court declined to adopt the "doctrine of reasonable expectations" in Florida. Under that doctrine, the *insured's* expectations as to the scope of coverage is upheld provided that such expectations are objectively reasonable. Id. The Court reasoned that there is no need for it if the policy provisions are ambiguous because "... in Florida ambiguities are construed against the insurer." Id.

Here, it is the *insurer and not the insured*, that seeks to invoke the doctrine. To apply the doctrine to an ambiguous policy, as suggested by the Plaintiff, in favor of the *insurer,* would be contrary to Florida law, negate the traditional construction guidelines, and ultimately rewrite the insurance policy in favor of the *insurer* when the insurer did not draft

To now read such an additional limitation into the Policy's language based on the Plaintiff's non-compelling parole evidence is contrary to Florida law. Here, given that the language used in the endorsement does not allocate fault, and in light of the Florida rule to broadly construe insurance policies in favor of coverage, it seems objectively reasonable that the additional insured would have expected that the endorsement provides coverage for liability connected to the named insured's operations, regardless of who was at fault. Under Florida law, it is improper for a court, under the guise of construction, to now impose contractual benefits or limitations on the parties which they themselves omitted. *Gendzier v. Bielecki,* 97 So.2d 604, 608 (Fla.1957).

In reaching this conclusion, I note that the Florida Supreme Court has followed courts in other jurisdictions that have likewise construed language of the kind used here in favor of coverage, determining that an insurer's failure to use restricted language to excluded specified types of liability infers that the parties intended not to so limit coverage. I rely on the Florida Supreme Court's decision in *Container Corporation of America*, which, in turn, relied on and approved the Illinois Appellate Court decision in *Casualty Insurance Co. v. Northbrook Property & Casualty Insurance Co.,* 150 Ill.App.3d 472, 501 N.E.2d 812 (Ill.App.Ct. 1986), where the language adding the additional insured read (in a manner

_____

the policy in its favor in the first place. *Deni* has been held to preclude testimony from either the insurer or the insured as to their respective intentions regarding coverage. *Lenhart v. Federated National Ins. Co.,* 950 So.2d 454, 460-461 (Fla. Dist. Ct. App. 2007) ("As a last resort, the insurer relies on sworn testimony by the Father and its own officials to the effect that both parties to the insurance contract intended that the policy would not cover Son because he was unlicensed. Such testimony, of course, collides with the familiar principle that clear contractual text may not be varied by parole testimony. At the same time, this argument seems to us little more than a variation on the theory of construing insurance policies according to the reasonable expectations of the parties. That theory was decisively rejected by the supreme court in *Deni Assoc. of Fla.....*") (emphasis added).

20

identical to the Policy language here) "but only with respect to liability arising out of operations performed for the additional insured by the named insured." The court held that because the policy language was not expressly limiting, the additional insured was entitled to coverage for its own negligence.

In sum, I conclude that the clear failure of the policy to be expressly limiting resolves the ambiguity in favor of the additional insured notwithstanding the Plaintiff's parole testimony on intent, custom or practice, which I do not find persuasive or compelling under the circumstances.

**B.      Whether, according to the terms of the AI Endorsement, the liability of the City of Miami Beach did arise out of any of the operations of Hurricane Beach Rentals performed for the City?**

**1.      The interpretation of "arising out of"**

I have already discussed that, under *James River*, the phrase "arising out of" is not ambiguous and should be interpreted broadly. See discussion at page 11, *supra*. The import of the words "arising out of" is not to import any particular standard of causation or theory of liability into an insurance policy, but, instead, to broad link a factual situation with the event creating liability and connoted only a minimal causal connection or incidental relationship. Thus, when an additional insured endorsement simply covers liabilities "arising out of" operations of the named insured performed for the additional insured, that endorsement includes coverage for liabilities caused by the additional insured's direct negligent acts, so long as those acts are connected to the named insured's operations performed for the additional insured. Although a "remote" connection between the Defendants' deaths and Hurricane Beach Rentals' operation would not suffice, I conclude

21

that the facts of this case clearly demonstrate the requisite causal connection where the beach chair rental agreement was "performed" for Miami Beach per its concession agreement with Hurricane Beach Rentals.

The Florida Supreme Court has already ruled that the reason the City owed a duty of care to Breaux and Poleyeff was because the City was operating a "public swimming area" at the 29th Street location, largely based upon the operations of Hurricane Beach Rentals. *Breaux v. City of Miami Beach*, 899 So. 2d 1059, 1065 (Fla.2005). The Court stated as follows:

> We conclude that the totality of the circumstances in the case demonstrates that the City was operating a "public swimming area" at the 29[th] Street location. The City knew that the public was using this location for swimming. There were no signs warning the public not to swim and both the Poleyeff family and the Breaux family saw people using the area for swimming. Moreover, although the City did not have a lifeguard station at the 29th Street Beach area, the City built beach facilities at this location and provided metered parking at the end of 29[th] Street. Of even greater significance, the City licensed a concessionaire to rent beach charis, umbrellas, and watercraft at this location, thereby deriving revenue from the public's use of this particular beach area. (emphasis added).

Thus, Hurricane Beach Rentals was operating as a concessionaire for the City of Miami Beach on the beach at 29th Street pursuant to a license issued by the City. Hurricane Beach Rentals was required by the City to furnish the insurance policy which is the subject of this action, naming the City as an additional insured, before the license would be issued. While it is true that the Florida Third District Court of Appeal has held that Hurricane Beach Rentals owed no duty to Breaux or Poleyeff, the operation of Hurricane Beach Rentals at 29th Street, being directly connected to a "public swimming area," created a legal duty owed by the City to Breaux and Poleyeff. Otherwise stated, there is a causal connection or relationship that is "more than a mere coincidence" between the beach chair/umbrella

22

operation at the "public swimming area" as used by Poleyeff and Breaux on the day of their

deaths and the legal duty care owed by the City to Breaux and Poleyeff. The evidence

substantiates that both families were attracted to this "public swimming area" precisely

because of the availability of the concession services which each utilized on the date in

question. The concession services also led to the concentration of beach goers at the 29th

Street location, which further gave the impression that the 29th Street location was a public

swimming area. Thus, the triggering language of the AI Endorsement is satisfied as the

liability of the City arose out of the operations of Hurricane Beach Rentals in operating the

beach chair/umbrella concession for the City which was used by both Breaux and Poleyeff

since, without dispute, both were present at the 29th Street Beach due to the operation

there of Hurricane Beach Rentals.

### 2.    The interpretation of "liability"

Plaintiff contends that coverage should nevertheless be denied because the City

cannot prove that it had a "liability" as required by the AI Endorsement. Specifically,

Plaintiff argues in its Post-Trial Memorandum [DE 195] that by the terms of the AI

Endorsement, Defendants' decision to enter into a Coblentz-type settlement agreement

was precluded a judicial determination of the City's liability, rendering Defendant with no

possibility of proving coverage.[10]

---

[10] Briefing on this issue was requested at the conclusion of trial. Plaintiff indicates
that this issue was raised in footnote 6 of its Proposed Findings of Fact and Conclusions
of Law [DE 189], which asserted that "the Cit y's ultimate liability has never been
determined. After the Florida Supreme Court concluded that the City owed an operational-
level duty of care and remanded the case to the trial court, the City of Miami Beach entered
into settlement agreements with the decedents' estates." On February 13, 2009, Plaintiff
filed its Post-Trial Memorandum [DE 195]. Defendants filed a Reply on February 20, 2009
[DE 196].

23

Under Florida law, where an insurer wrongfully refuses to defend its insured, "the insured's liability has been established by the settlement and the insurer may not later relitigate this issue, provided that the settlement agreement was not the product of fraud or collusion. *Ahern v. Odyssey Re (London) Ltd.*, 788 So. 2d 369, 372 (Fla. Dist. Ct. App. 2001). In that case, the appellate court reversed the trial court and extended policy coverage to the estate of the deceased, holding that the insured's liability to the deceased was established by *Coblentz* settlement agreement. Id. The court reasoned that:

> To hold otherwise would mean that the surety company ... may refuse to defend that suit and stand by while that issue is definitely presented and tried, and then, upon judgment being entered against the defendant, and the defendant being found unable to respond in damages, and execution being returned nulla bona, may again, when the plaintiff seeks to recover in the right of the insured under the terms of the policy from the surety company, present the same issues, which have been once tried and determined, for another trial and determination in the same court.

Id. This principle that an insurer that wrongfully refuses to defend the insured is bound by the terms of a settlement between the insured and the injured party and may not relitigate the issue of liability has been reaffirmed in numerous subsequent cases in Florida. E.g., *Gallagher v. Dupont*, 918 So. 2d 342, 347-48 (Fla. Dist. Ct. App. 2005); *Wright v. Hartford Underwriters Ins. Co.*, 823 So.2d 241, 242-43 (Fla. Dist. Ct. App. 2002); *Wrangen v. Pa. Lumbermans Mut. Ins. Co.*, 2009 WL 151715, *4 (S.D. Fla., Jan. 16, 2009). Florida law therefore explicitly provides that liability can be established by a settlement agreement.[11]

---

[11] Plaintiff implicitly argues that "liability" by definition can only come about from a judicial determination. The plain meaning of the word "liability," however, suggests otherwise. The word "liability" means "the quality or state of being legally obligated or accountable; [a] legal responsibility to another or to society, enforceable by civil remedy or criminal punishment;...[a] financial or pecuniary obligation." Black's Law Dictionary (8th ed. 2004). Without question, a settlement agreement can give rise to such obligations and responsibilities.

24

Here, I similarly conclude that the City's liability has been established by the settlement agreements and does not require a separate judicial determination.[12]

Further, when an insurer has denied coverage that actually exists, the insurer has in effect breached the insurance contract and cannot be allowed to rely upon a contractual provision prohibiting the insured from settlement of the claim in order to relieve itself from liability. *Mercury Ins. Co. of Fla. v. Anatkov*, 929 So.2d 624, 627 (Fla. Dist. Ct. App. 2006) (quoting *Infante v. Preferred Risk Mut. Ins. Co.*, 364 So.2d 874, 875 (Fla. Dist. Ct. App. 1978) (stating that "[a]n automobile liability insurer, which has refused to honor a claim under uninsured motorist benefits prior to an insured's settlement with a tortfeasor, may not rely upon a settlement thereafter as a basis to deny coverage")). Here, Plaintiff attempts to rely on the City's decision to enter into the settlement agreements to avoid coverage even though the AI Endorsement, in contrast with *Mercury Ins. Co.*, contains no explicit prohibition on settlement. Accordingly, under Florida law, Plaintiff cannot rely on the fact that Defendant's liability was established through settlement to avoid coverage.

Plaintiff nevertheless argues that liability must be judicially determined and any determination of liability by this Court at this time would be mere speculation. In support, Plaintiff relies on two cases, *Aetna Ins. Co. v. Waco Scaffold*, 370 So. 2d 1149 (Fla. Dist. Ct. App. 1978) and *Triple R Paving v. Liberty Mutual*, 510 F. Supp. 2d 1090 (S.D. Fla.

---

[12] At the time the settlement agreements were entered, the Florida Supreme Court had already found that the City "had an operational-level duty of care to warn the public of any dangerous conditions of which it knew or should have known at the 29th Street beach area." *Breaux*, 899 So. 2d at 1065. Further, the City had admitted that it knew the public was using the 29th Street beach; that it knew rip currents were present from time to time but had no surf condition warning system in effect there, and that there was no warning system in place at 29th Street to warn the public that there was no lifeguard station there. Agreed Fact GG.

2007). These two cases are not on point, as conceded by Plaintiff, and are not sufficiently persuasive. In *Aetna*, the court was faced with a dispute between an additional insured, a scaffolding company found liable for product liability, and the insurance carriers of the underlying products liability insurance policy. The court held that the insurance carriers of the underlying policy did not owe contribution to the additional insured or its excess carrier because the general verdict finding the scaffolding company liable did not distinguish its liability between claims that would and would not fall within the coverage of the policy. It noted that it was the burden of the additional insured to apportion its damages to claims that were subject to coverage and that the impossibility of doing so would leave the additional insured without a remedy. *Aetna*, 370 So. 2d at 1152. Despite this authority, Plaintiff does not argue that the settlements in this case encompass claims not subject to coverage under the AI Endorsement or that the City has failed to apportion its liability to claims that are subject to coverage. Indeed, the settlement establishes only the liability for the City's negligence for failing to warn Breaux and Poleyeff of dangerous conditions at the 29th Street Beach, which as discussed above, was found to be a duty owed to the deceased by the Florida Supreme Court and for which coverage exists under the policy at issue here. *Triple R Paving* is inapposite to the present case, where the court stayed plaintiff's declaratory action because ongoing litigation had not yet resulted in a determination of liability. *Triple R Paving*, 510 F. Supp. 2d at 1093. This case does not speak to whether a settlement agreement can establish liability, much less whether it would necessarily involve speculation by the court. In sum, Plaintiff's cited authorities are of limited value. Accordingly, in light of the prevailing law in Florida, the City has

26

demonstrated that it had a "liability" as required by the AI Endorsement provided it wrongfully refused to defend.[13]

## C.    The inapplicability of the Lifeguard Exclusion

The Plaintiff also has asserted that the "Lifeguard Endorsement" in its policy excludes coverage for the City.  The exclusion provides that:

> This insurance does not apply to "bodily injury", "property damage", "personal injury" and "advertising injury" for which the insured may be held liable because of the rendering or failure to render lifeguard services and/or life saving equipment.

It is evident from a plain reading of the exclusion that this Endorsement would exclude the liability of the City of Miami Beach for failure to render lifeguard services arising out of the operations performed for the City by or on behalf of Hurricane Beach Rentals.  As set forth in Agreed Fact K above and as conceded by Defendant, the underlying state court complaints against the City allege several counts of negligence that would fall within the language of the exclusion.  However, I conclude that the exclusion would not apply to the allegations that the City failed to operate a designated water recreation area in a reasonably safe manner, failed to have a warning system for rip currents and/or other dangerous surf conditions by use of  warning signs, warning flags, condition boards, or other warning means, failed to post warnings that the beach was unguarded and that swimmers should proceed eight blocks south to 21st Street or 6 blocks north to 35th Street, where lifeguards were present, before entering the ocean.  See Agreed Fact K.  These allegations are premised on the City's failure to warn of potentially dangerous conditions

---

[13] The issue of wrongful refusal to defend will be addressed at Phase II of the bifurcated trial.  Agreed Fact II.

in the ocean in the 29th Street beach area, not the failure to render lifeguard services and/or life saving equipment.[14] The City was found to owe such a duty to warn, and as discussed above, its failure to do so resulted in liability for the City that falls within the scope of the AI Endorsement. Accordingly, the Lifeguard Exclusion is not applicable to bar coverage.

## V. CONCLUSION

For the reasons stated in the decision, I conclude that the Monticello policy affords coverage to the City of Miami Beach for the cause of action alleged in the underlying state court complaint.

**WHEREFORE,** it is **ORDERED** that the cause shall proceed to the second phase of the bifurcated proceedings in accordance with a further order to be entered by the Court.

**ORDERED** this 10 day of March, 2009.

THE HONORABLE ALAN S. GOLD
UNITED STATES DISTRICT JUDGE

cc:
All counsel of record
U.S. Magistrate Judge Chris M. McAliley

---

[14] The term "lifeguard services" and "life saving equipment" is not defined in the policy. Agreed Fact U. The plain meaning of these terms indicate that the exclusion would not encompass claims of failure to warn of dangerous conditions. Further, as discussed at length above, to the extent such terms are ambiguous, it would be construed against Plaintiff in favor of coverage.

28